## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

BILLY RAY ROBERTSON,               :        PRISONER HABEAS CORPUS
GDC # 824124,                      :        28 U.S.C. § 2254
     Petitioner,                 :
                                 :
v.                                 :        CIVIL ACTION NO.
                                 :        1:07-CV-0797-RWS
ALEXIS CHASE, Warden,              :
     Respondent.                 :

### FINAL REPORT AND RECOMMENDATION

Petitioner, Billy Ray Robertson, (hereinafter, "Robertson" or "Petitioner"), an inmate at the Men's State Prison in Hardwick, Georgia, seeks via 28 U.S.C. § 2254 to challenge the constitutionality of his March 14, 1995, convictions in the Forsyth County Superior Court for felony murder, armed robbery, and burglary.

## I.    PROCEDURAL HISTORY

On February 10, 1993, Petitioner was indicted with Kenneth Brady ("Brady") and Felton Junior Avery (a/k/a/ Junior Avery)("Avery") by a Forsyth County grand jury on two counts of murder and two counts of armed robbery of Tony and Kathy Reid.  Robertson v. State, 493 S.E.2d 697, 700 & n.1 (Ga. 1997).

Robertson's case was severed from that of Brady and Avery. Robertson, 493 S.E.2d at 700.  Brady and Avery were convicted for the crimes after they were tried

together between March 14 and March 28th, 1994. Robertson testified at their trial under a grant of use immunity. Avery appealed and his conviction was affirmed by the Georgia Supreme Court on July 13, 1998.  Avery v. State, 502 S.E.2d 230 (Ga. 1998).

On December 12, 1994, Petitioner was separately re-indicted on one count each of burglary, conspiracy to commit burglary, armed robbery, conspiracy to commit armed robbery, murder, and conspiracy to commit murder.  Robertson, 493 S.E.2d at 700. Petitioner's jury trial was conducted on February 27, 1995, through March 9, 1995.  The jury found Petitioner guilty of felony murder as a lesser included offense of malice murder, not guilty of conspiracy to commit murder, and guilty of the remaining counts.  Id. [Doc. 23-1, p. 38].[1]  The trial court merged the conspiracy convictions with their substantive counterparts, and sentenced Petitioner on March 14, 1995, to life in prison for felony murder, a consecutive twenty-year sentence for armed robbery, and a consecutive twenty-year sentence for burglary.  Robertson, 493 S.E.2d at 700.

---

[1]Respondent's exhibits are referenced according to the attachment and page numbers given by the Adobe File Reader linked to the Court's case file database ("CM/ECF").

AO 72A
(Rev.8/8
2)

Petitioner appealed, and, on December 3, 1997, the Georgia Supreme Court affirmed Petitioner's convictions and sentences for felony murder and burglary but vacated the conviction for armed robbery, finding that it merged with the felony murder conviction as the underlying felony. Robertson, 493 S.E.2d at 705. On December 19, 1997, the Georgia Supreme Court denied Petitioner's motion for rehearing. Id. On May 26, 1998, the United States Supreme Court denied certiorari. Robertson v. Georgia, 523 U.S. 1140 (1998).

Robertson was not re-sentenced until January 7, 2005. Robertson v. State, 635 S.E.2d 138, 139 (Ga. 2006). The trial court imposed a new sentence in which the armed robbery count was merged into the felony murder count. Id. Petitioner appealed the new sentence, alleging that the trial court erred in refusing to appoint counsel to represent him at the re-sentencing. [Doc. 12-3]. On September 18, 2006, the Georgia Supreme Court affirmed the re-sentencing, holding that the trial court's re-sentencing of Petitioner on remand was a ministerial act, and thus it could be performed in the absence of counsel acting on Petitioner's behalf. Robertson, 635 S.E.2d at 139.

While Petitioner's direct appeal of the re-sentencing was pending in the Georgia Supreme Court, Petitioner signed a state habeas corpus petition on

3

November 5, 2005, challenging his convictions and sentences. This petition was filed in the Baldwin County Superior Court on November 29, 2005. [Doc. 12-6]. The state habeas corpus court conducted an evidentiary hearing on January 6, 2006, and denied relief by written order entered on May 25, 2006. [Doc. 12-8]. On February 5, 2007, the Georgia Supreme Court denied Petitioner's application for a certificate of probable cause to appeal the denial of habeas corpus relief. [Doc. 12-11].

On March 28, 2007, Petitioner signed the instant federal habeas corpus petition. [Doc. 1]. Respondent filed a motion to sever and dismiss Grounds One and Two as untimely because they were not filed within the one-year statute of limitation contained in 28 U.S.C. § 2244(d)(1). [Doc. 10]. I issued a Report and Recommendation recommending that this motion to dismiss be denied [Doc. 14], which was adopted by the district court judge on January 24, 2008. [Doc. 15].

On May 22, 2009 I appointed the Federal Defender Program, Inc. to represent Petitioner and ordered that the attorney assigned to represent Petitioner file an amended petition and brief in support of the amended petition. After numerous extensions of time, Petitioner filed his amended petition and brief on January 5, 2011.

4

[Doc. 38].  Respondent filed his response on May 9, 2011 [Doc. 48], and Petitioner filed a reply on May 14, 2011. [Doc. 51].

## II.    FACTS

On December 18 or December 19, 1989, Tony and Kathy Reid were murdered in their house by gun shots to the backs of their heads.  When their bodies were discovered on December 19th, the police observed that drawers to a safe and china cabinet in their house were open.  The Reids' wallets, Kathy Reid's rings, money from Tony Reid's business and other items were missing, indicating that a robbery had taken place.

Tony Reid owned a car lot and the Oakwood Auto Auction. Robertson had previously worked for Tony Reid.

There were no substantial leads in the investigation of the murders until 1992 when law enforcement officers made contact with an individual named Carl Eugene "Gene" Hammett. ("Hammett")[Doc. 19-6, p. 56].

### A.    Law Enforcement Officers Learn About Gene Hammett and make arrangements for him to tape record his conversations with Kenneth Brady

In early 1992, law enforcement officers investigating the Reid murders learned that Hammett might have information about the case.  Hammett had spent about

5

twenty years in prison and had been released from prison in April 1990.   He then resumed his friendship with his close friend, Kenneth Brady, whom he had known most of his life. [Doc. 21-1, p. 80-87].

Kenneth Brady had been serving a prison sentence since February 2, 1983 for armed robbery.  He was paroled on October 5, 1989.  He was incarcerated briefly in the Gwinnett County Jail in January 1992.  His parole was revoked on June 5, 1992 and he was placed back in prison at that time.   He was again paroled on September 22, 1992. [Doc. 23-4, p. 45].

Georgia Bureau of Investigation ("GBI") Agent Billy Stone and William Miller, an investigator with the Forsyth County Sheriff's Department, interviewed Hammett and learned from him that he had talked to Kenneth Brady about the Reid murders during one of the intervals when Kenneth Brady was not in jail. [Doc. 21-1, p. 62].  Hammett agreed to make recordings of his conversations with Brady about the Reid murders.  Kenneth Brady was in the Gwinnett County jail on January 14th and 15th, 1992.  Officers  made arrangements for Hammett to be placed in jail with Kenneth Brady during that time and attempt to make recordings of him while they were in jail together. [Doc. 21-1, pp. 63, 93].  However, according to Hammett, he

6

AO 72A
(Rev.8/8
2)

and Kenneth Brady could not talk about the Reid murders in the jail because there were too many people around.  [Doc. 21-1, p. 93].

After Kenneth Brady was paroled on September 22, 1992, officers again attempted to have Hammett tape record his conversations with Kenneth Brady about the Reid murders. [Doc. 21-1, pp. 64, 96].  Hammett made several tape recordings of his conversations with Brady during November and December of 1992 while the two men drove around in Hammett's car. [Id., p. 96-8].

Hammett testified about his conversations with Kenneth Brady at the trial of Kenneth Brady and Felton Avery, and later at Robertson's trial.  Also, at Robertson's trial, portions of the tape recordings were played and transcripts were made available to the jurors.

**B.**     **Robertson's Trial**

As stated above, Robertson was tried separately between February 27, 1995 and March 9, 1995.  The prosecution's theory of the case, as explained during the prosecutor's opening statement, was that the murders were committed by Kenneth Brady and Felton Avery based on information supplied by Robertson to Kenneth Brady. [Doc. 19-5, p. 103-105].

7

AO 72A
(Rev.8/8
2)

Kenneth Brady did not testify at Robertson's trial. Brady's attorney had advised Robertson's attorney that Brady would invoke his Fifth Amendment right not to incriminate himself if called to testify. [Doc. 20-2, p. 116-17].

Felton Avery, who did testify, did not know Robertson, and had no personal knowledge of any involvement by Robertson in the murders. The State's case was based in part on the out-of-court statements that Kenneth Brady had made to Gene Hammett and Felton Avery that there was a "set up man" for the Reid murders and for three unrelated burglaries (two that took place in November, and another that was planned for January). Brady's out-of-court statements to Hammett and Felton Avery included information about the "set-up man". Other evidence introduced at the trial connected Robertson with the description of the "set-up man" for the Reid murders and the unrelated burglaries. [Doc. 18-3, pp. 87-98].

### 1.  Hammett's testimony

Gene Hammett testified at Robertson's trial that he had known Kenneth Brady most of his life and considered him a close friend. Hammett met Felton Avery when he (Hammett) got out of prison on April 24, 1990. At that time, Hammett also renewed his friendship with Kenneth Brady. One evening in 1990, Kenneth Brady told Hammett that he killed two people in Forsyth County. On a later occasion Brady

8

told Hammett that Felton Avery had committed the murders, but Hammett reminded Brady that Brady had previously told Hammett that he (Brady) had committed the murders. Brady explained that he hadn't wanted to bring up someone else's name, but Avery had actually been the shooter. [Doc. 21-1, pp. 82-90].

After the first two conversations, Hammett started recording his conversations with Brady at the direction of Agent Stone. [Doc. 21-1, p. 91]. The police paid Hammett about $400.00 for his assistance. [Doc. 21-1, p. 99].

In response to a question by the prosecutor to Hammett about whether Hammett ever talked about anyone else that was involved in the murders, Hammett testified that "Kenneth never called any names. The only thing he told me, that somebody at Winder run a car lot set the jobs up, and that's all he said". Hammett also said that Kenneth Brady talked some about Avery's role. [Doc. 21-1, p. 100]

In response to the prosecutor's question, "Did Mr. Brady ever say anything about the set-up man? About any money to the set-up man?" Hammett said that Kenneth Brady had described an occasion when he (Kenneth Brady) had seen the "set up man" to give him some money, but the man did not want to take any money. Kenneth Brady then stuck the money in the man's pocket and threatened to kill his family if the man did not keep it. Specifically, Hammett testified:

9

Well, we was talking one day, I don't know where it was on tape or what. We was talking and - - I hadn't been out of prison too long, and I was trying to get him to talk more. And I said, "Well, the guy that set you up, reckon he'd set a job up for me? I'm about ready to rob somebody or do something myself." And he - - never told me who it was or nothing. He just said that he went to give the man some money and the man said if - - he didn't think - - you know, he didn't know nothing like that was going to go on. And he said he told him, "Well, when you're doing something like that, anything is liable to happen." And he said – and he said that the man didn't want to take the money. And he said, "I stick it in his . . ." well, he cussed - -" ... in his shirt pocket and told him, by God, he'd take it or . . ." – and "I'd do away with him, his wife and his kids." That's now, he did say that and I don't know who he was talking about.

[Doc. 21-1, p. 101-2].

Other evidence admitted at trial supported an inference that Robertson was the person to whom Kenneth Brady referred to as the "set up man" in his conversation with Hammett. Specifically, Robertson operated a car lot in Winder, and Kenneth Brady's description to Hammett of his (Brady's) threats to the "set-up man" matched the description of Robertson's account of threats made to him by Kenneth Brady on December 19th at S & M Motors, a used car lot (discussed below). [Doc. 18-3, pp. 91-97].

Over the objection of defense counsel, portions of the tapes made by Gene Hammett were played by the state for the jury. Transcripts had been prepared by the

10

State, and, over Petitioner's objection, they were distributed to the jury for the jurors' use while listening to the tapes. [Doc. 21-2, pp. 13-28].

### 2.    Felton Avery's testimony

Felton "Junior" Avery, who along with Kenneth Brady had been convicted a year earlier of the Reid murders, testified under a grant of derivative use immunity. In his testimony, he denied committing the murders, but admitted helping Kenneth Brady cover up his role in the hours after the murders had been committed. [Doc. 21-4, pp. 35-94].

Avery testified that he had known Kenneth Brady since they were children and spent a lot of time with him after Brady got out of jail in October 1989. Avery had been solicited by Kenneth Brady to commit an armed robbery in Forsyth County. The morning of the Reid murders, Avery met Brady at a motel where Brady was staying. Brady wanted Avery to ride with him to the house to be robbed. He told Avery that the male homeowner would be home. Avery declined Brady's offer. [Doc. 21-4, pp.45, 52, 58-9, 104-106]

That evening, Avery was in a motel room in DeKalb County and received a page from Brady. Avery called Brady who said that he had something important to tell Avery and that they needed to talk. Brady said something had gone wrong with

AO 72A
(Rev.8/8
2)

the job.  The two men met at a motel parking lot where Brady told Avery that the job

had been bungled, and a man and a woman were killed.  Brady asked Avery to go

back into the house to remove a piece of duct tape that had been left on the dead man's

arm.  Avery went to the Reid's house, removed the tape from Tony Reid's arm, told

Brady the job was done, and later was given $800 by Brady.  [Doc. 21-4, pp. 65-9,

110-12, 115-16].

Kenneth Brady gave Avery information for three other burglaries:  Peach State

Salvage Company, Peach State Auto ("the Peach State companies") and the home of

Jerry Reed.  Avery burglarized the Peach State companies in November 1989.  He

surveilled Reed's house in January 1990 to prepare to burglarize it, but later decided

not to burglarize the house.  [Doc. 21-4, pp.  71, 76-7]

In the past, Robertson had worked for both Peach State Salvage and Jerry Reed.

Kenneth Brady told Avery that the "set up" man who had supplied information on

Tony Reid had also supplied information on the Peach State companies and Jerry

Reed.  [Doc. 21-4, pp 84; 21-5, p. 18, 21].

Shortly after the murders of the Reids, Brady told Avery that he was going to

take the "set up" man some money.  Brady told Avery that the man who had given him

information about the Reids used to work at a particular car lot, and that in January

12

1990, the "set up" man was out of town painting. This information matched evidence introduced at trial about Robertson.    [Doc. 21-4, pp 87-8, 90].

Sometime after January 1990, Kenneth Brady took Avery to a house in Lawrenceville and told Avery that the house belonged to the man who had supplied the information about the Reids.  Brady told Avery that the owner of that house was being interviewed by the GBI.  Brady asked Avery to kill the man who lived there if anything happened to Brady. [Doc. 21-4, pp. 85-6;  21-5, pp. 8, 9].  At Robertson's trial, Avery identified a picture of Robertson's house as the house in Lawrenceville that Brady had shown him.  Brady never mentioned Robertson's name to Avery. Avery did not know Robertson, but when he saw Robertson in the courtroom at Robertson's trial, he recognized him as someone who had come to his house one time with Kenneth Brady.  Avery had never spoken to Robertson.  [Doc. 21-4, pp. 86-90]

### 3.    **Robertson's version of events**

GBI Agent Stone interviewed Robertson on December 21, 1992, and the videotape of this interview was played for the jury at Robertson's trial.  Police spoke with Robertson on two other occasions: December 31, 1992 and January 8, 1993. [Doc. 21-2, p. 98].  Transcripts of those interviews were introduced as exhibits at Robertson's trial.  Robertson testified on his own behalf at his trial.  Robertson's

13

version of events, as told to the officers during his 1992 and 1993 interviews[2], and at his trial in December 1994, is consistent on all material points and is largely consistent with the testimony of Alfred "Junior" Brady, Kenneth Brady's brother.  That version of events is summarized below:

Alfred "Junior" Brady ("Junior Brady" or "Junior") had been a friend of Robertson's for a long time.  The two men and their wives occasionally socialized at the Robertsons' house.  Robertson and Junior Brady were planning on going into business together on a used car lot in Winder that would be operated by Robertson and financed by Junior Brady. [Doc. 22-2, p. 74].

On December 7th or 8th, 1989, Junior Brady and his wife Sherry, visited Robertson and his wife Margaret at their home.  Robertson and Junior played cards while Sherry and Margaret socialized.  At some point, while Robertson and Junior were playing cards, Junior's brother, Kenneth Brady, called and spoke with Junior. Junior asked Robertson if Kenneth could come over and join the card game, and Robertson invited Kenneth to join the game. [Doc. 22-2, pp. 76-8].

_____

[2]Robertson had been interviewed by law enforcement on January 12 and 19, 1990, shortly after the murders, but did not tell law enforcement that he knew anything about Kenneth Brady's association with the Reid murders during those interviews. [Doc. 19-6, pp. 65-7, 21-1, pp. 49-54]

14

After Kenneth arrived, the card game continued. Eventually, Junior and Sherry left and went home. Kenneth left shortly thereafter. Kenneth Brady and Junior and Sherry Brady returned to the Robertson's home one more time in December to play cards. During one of the games, small wagers were made, and Robertson ended up losing $30.00 to Kenneth Brady. [Doc. 22-2, p. 79-110].

Around noon on either December 17th or 18th, Robertson received a call from Kenneth Brady. Brady was at a motel in Lawrenceville, Georgia, and asked Robertson if he would come by the motel and give him a ride. Since Robertson owed Brady $30.00 from the card game a week or so earlier, Robertson viewed this as an opportunity to pay Brady what he owed him. [Doc. 22-2, p. 109].

Robertson went to the motel with the intention of paying his debt and to give Kenneth Brady a ride. Robertson entered Kenneth Brady's hotel room, and Brady offered him marijuana and cocaine. The two men proceeded to smoke marijuana, snort cocaine, and drink alcohol. After consuming the drugs and alcohol, Kenneth Brady asked Robertson to give him a ride to visit someone. Robertson drove Brady to a house, they knocked on the door, no one was home, and they left. [Doc. 22-2, p. 92-109].

15

After leaving the house, the two men drove around, consuming more marijuana and cocaine.  At some point during the ride, Kenneth Brady asked Robertson about Tony Reid.  Robertson told Kenneth Brady that he knew Tony Reid.  They discussed whether Tony Reid was involved with drugs, and Robertson told Brady that Tony Reid was not involved with drugs. Robertson admitted that he could have possibly driven Kenneth Brady by the Reid house or in the direction of the Reid house, but he had no recollection of having done so. [Doc. 22-2, p. 109-115].

At some point, Robertson felt too impaired to drive, and Brady took over driving Robertson's car.  Eventually, Robertson dropped Brady off at his motel.  Robertson remembered that it was daylight when he left the motel and drove home. He went to bed when he got home.  [Doc. 22-2, p. 116].

On December 18th or 19th, before the Reids' bodies were discovered, Junior Brady unexpectedly arrived at Robertson's house and requested that Robertson go with him to S & M Motors, a used car lot, to look at a trailer that they could potentially use at the car lot they were planning to open.  While they were at S & M Motors, Robertson looked outside and saw Kenneth Brady.  Kenneth Brady motioned for Robertson to come outside.  Robertson was surprised to see him there and went outside.  [Doc. 22-2, pp. 120-24].

AO 72A
(Rev.8/8
2)

Once outside, Kenneth Brady told Robertson that Tony Reid was dead, but he (Brady) didn't have anything to do with it and didn't know what happened. Brady made some confusing remarks to the effect that he (Brady) had said something to the wrong people about drugs, that dangerous drug dealers were involved, that he (Brady) could get killed over this, and that Robertson should not say anything because Brady and Robertson could go to jail over this. Brady said that Robertson and his family could get killed if he said anything. Brady added that Tony Reid's wife was dead also. [Doc. 22-2, pp. 125-7; 22-3, p. 1].

The following Sunday, Robertson called Junior Brady and asked him to meet him at the local Walmart store. Once at the Walmart, Robertson asked Junior Brady if he would get in touch with Kenneth because he (Robertson) was in trouble. Robertson told Junior Brady that he had been with Kenneth all day at a motel, had been drinking with him, and had told Kenneth where the Reids lived. Robertson told Junior Brady that Kenneth had threatened to kill him (Robertson) and his family. Robertson asked Junior Brady to ask Kenneth Brady not to bother him and his family. [Doc. 22-3, pp. 9-11]

Junior Brady then went home and called his brother Kenneth. Junior Brady then called Robertson and told him that he had spoken with Kenneth and that Kenneth

17

said that there was nothing for Robertson to worry about, and he should just "keep his

mouth shut." Junior Brady later asked Robertson if he needed a gun. The next day,

Junior loaned his gun to Robertson, which Junior later retrieved. [Doc. 20-5, p. 121-4]

### C.      Summary of Facts by the Georgia Supreme Court

The Georgia Supreme Court summarized the facts as follows:

On December 18 or December 19, 1989, Tony and Kathy Reid were
murdered, execution-style, in their home, which had been ransacked by
intruders. Tony Reid was in the used car business and defendant, who
was also in that business, was well acquainted with him. In fact, at one
time, defendant worked for Reid.

Kenneth Brady had been released from prison in October 1989.
Defendant and Kenneth's brother, Junior Brady, were good friends. In
early December, Kenneth dropped by defendant's house and played
cards with defendant and Junior. The next day, Kenneth telephoned
defendant and invited him to meet at a motel in Gwinnett County.

Defendant went to the motel and met with Kenneth. They smoked
marijuana and inhaled cocaine. Then defendant and Brady went for a
drive in the country where they continued to inhale cocaine and drink
beer.

A few days later, Kenneth asked Felton Avery if he would be willing to
burglarize the Reids' house with him. Avery balked because Kenneth
told him that Tony Reid would be home. Later that night, Kenneth
telephoned Avery and asked for his help. He told Avery that the burglary
had been bungled and the Reids had been killed. He asked Avery to go
to the Reids' house and retrieve a piece of tape he left on Tony's wrist.
Avery did so and Kenneth gave him $800.

AO 72A
(Rev.8/8
2)

The next afternoon, defendant and Junior Brady visited a used car lot. While Junior spoke with the owner of the lot, Kenneth drove up, talked with defendant, and put $100 in defendant's pocket. Later, the owner of the lot watched the evening news and learned that the Reids had been murdered.

Not long after, defendant telephoned Junior Brady and asked him to meet at a Wal-Mart. As defendant and Junior walked the aisles of the store, defendant told Junior that he was in trouble because he had shown Kenneth where the Reids lived; that both he and his family had been threatened; and that Junior would have to keep Kenneth away from him. That night, Junior talked with Kenneth; he then called defendant and told him he had nothing to worry about-and he should keep his mouth shut. Shortly thereafter, defendant went to South Carolina where he painted houses for several weeks.

Around that time, Kenneth and Felton Avery drove by defendant's house. Kenneth told Avery that the man who "set up" the Reids lived in the house; that he was being interviewed by the GBI; and that, if anything were to happen to Kenneth, Avery should kill the "set up" man.

Kenneth gave Avery information for two other burglaries: Peach State Salvage Company and the home of Jerry Reed. Avery burglarized the Peach State Salvage Company in November 1989. He surveilled Reed's house in January 1990, but decided not to burglarize it.

In the past, defendant had worked for both Peach State Salvage and Jerry Reed. Kenneth told Avery that the "set up" man who supplied information on Tony Reid, also supplied information on Peach State Salvage and Jerry Reed.

<u>Robertson</u>, 493 S.E.2d at 700-01.

19

## III.   DISCUSSION

### A.   Standard of Review

A federal court may not grant habeas corpus relief for claims previously adjudicated on the merits by a state court unless the state court adjudication resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  Childers v. Floyd, 642 F.3d. 953, 971 (11th Cir. 2011) (en banc) (quoting Williams v. Taylor, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)).

An "unreasonable application" of federal law occurs:

> when the "state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." [citations omitted] Therefore, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the

AO 72A
(Rev.8/8
2)

correctness of the state court's decision." <u>Harrington v. Richter</u>, ——— U.S. ———, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (citation and internal quotation marks omitted). Even if we believe the state court's decision to be incorrect, we cannot issue the writ unless that decision was also unreasonable. <u>Terry Williams</u>, 529 U.S. at 412, 120 S.Ct. at 1523.

<u>Childers</u> 642 F.3d at 971-2.

This court is limited to the record that was before the state court in deciding whether to grant relief under 28 U.S.C. § 2254(d)(1). <u>Cullen v. Pinholster</u> , 131 S. Ct. 1388 (2011).

Pursuant to 28 U.S.C. § 2254(e)(1), the state court's determinations of factual issues are presumed correct unless the petitioner presents clear and convincing evidence that the state court determinations were erroneous.  Petitioner has not presented grounds to rebut the presumption that the state court's factual determinations were correct.

Also, Petitioner has made no showing as required by 28 U.S.C. § 2254(e)(2).  Section 2254(e)(2) provides that the district court may hold an evidentiary hearing only when petitioner has shown either:  (1) that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)), or, (2) that the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C.

21

§ 2254(e)(2)(A)(ii)); and, the facts underlying the claim show by clear and convincing evidence that but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

For these reasons, I will not hold a federal evidentiary hearing.

### B.     Robertson's Confrontation Clause Argument

Robertson argues that his rights under the Confrontation Clause of the United States Constitution were violated by the admission of the tape recordings between Kenneth Brady and Gene Hammett.  In his reply brief, Robertson also challenges, on Confrontation Clause grounds, the testimony of Felton Avery about statements made to him by Brady related to the "set up man".  (Doc. 51 at p. 3).  Because this argument was raised only in Robertson's reply brief, not in the original brief, I will not consider it.[3]

### 1.     Robertson's Current Confrontation Clause claim is not procedurally defaulted.

Respondent argues that the Confrontation Clause claim, in its current version, is procedurally defaulted. Respondent concedes that Robertson challenged, on

---

[3]In any event, for reasons discussed below with respect to Kenneth Brady's statements to Hammett, the admission of out-of-court statements from Brady to Avery would not be grounds for granting this habeas petition.

AO 72A
(Rev.8/8
2)

Confrontation Clause grounds, the admissibility of the tapes that Hammett made of Brady.  <u>See</u> Doc. 48-1 at p. 17 (stating that as Petitioner's eighteenth enumerated error on direct appeal, Petitioner alleged error from the admission of Brady's taped statements, in part because the admission of the tapes denied him the right of confrontation).  However, Respondent argues that the claim is nonetheless defaulted because the underlying arguments in support of the confrontation clause claim have changed.  Specifically, Respondent argues that the claim is defaulted because Petitioner did not assert in the state court that the tapes were "not made in furtherance of a conspiracy since the tapes were made after the fact." (Doc. 48-1 at p. 18).  I reject this argument.

Petitioner did enough to present his Confrontation Clause claim to the Georgia Supreme Court.  On direct appeal, he set forth the factual basis of his claim and relied on the Confrontation Clause as support for his argument. [Doc. 18-3, p. 44].  Petitioner also argued to the Georgia Supreme Court that the tapes were "not admissible until some evidence of a conspiracy was shown and none was shown." [Doc. 18-3, p. 43].

A petitioner's claim need not be expressed in this court in the identical manner it was presented in state court in order to be properly presented in a federal habeas action.  Some reformulation of a claim is permissible as long as the substance of the

23

argument is the same.  See Lanigan v. Maloney, 853 F.2d 40, 44 (1st Cir.1988);

Picard v. Connor, 404 U.S. 270, 277-78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)

("Obviously there are instances in which the ultimate question for disposition will be

the same despite variations in the legal theory or factual allegations urged in its

support . . . .  We simply hold that the substance of a federal habeas corpus claim must

first be presented to the state courts.").  In sum, Petitioner's Confrontation Clause

claim was not defaulted and is properly before this court.

### 2.   Petitioner is not entitled to a *de novo* review of his Confrontation Clause Claim.

The Georgia Supreme Court did not specifically address any Confrontation

Clause issue as to Hammett's tapes or testimony.  The Georgia court's only mention

of the Sixth Amendment was with respect to Avery's testimony.  Robertson, 268 Ga.

at 776; [Doc. 48-1, p. 18].  Robertson argues in his reply brief that the State Court's

failure to address his Sixth Amendment claim as to Hammett means that this Court

must make a *"de novo* determination free from the constraints of 28 U.S.C.

§ 2254(d)(1)".  [Doc. 51, pp. 6-7].  I reject this argument because it is contrary to

Supreme Court and Eleventh Circuit authority.

AO 72A
(Rev.8/8
2)

A summary adjudication—a state court decision denying a petitioner's claim without an accompanying statement of reasons—is an adjudication on the merits under 28 U.S.C. § 2254(d). Harrington v. Richter, ⸺ U.S. ⸺, 131 S.Ct. 770, 780, 784, 178 L.Ed.2d 624 (2011). In Childers, the Eleventh Circuit stated that "unless the state court clearly states that its decision was based solely on a state procedural rule, we will presume that the state court has rendered an adjudication on the merits when the petition's claim 'is the same claim rejected' by the state court." Childers, 642 F.3d at 969. Further, as the court in Childers recognized, any adjudication on the merits is not reviewed de novo on a federal habeas petition, but rather is reviewed under the deferential standard of 28 U.S.C. § 2254(d), discussed below. Id. at 971.

Because the Georgia Supreme Court's decision in Robertson did not rest on a state procedural bar, its decision is an adjudication on the merits under § 2254(d)(1). As such, relief may not be granted to Petitioner unless the Georgia Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

AO 72A
(Rev.8/8
2)

3. **Crawford v. Washington applies to Petitioner's Confrontation Clause Claim.**

Robertson alleges that the introduction of Brady's statements to Hammet violates <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). As noted above, Petitioner's final sentencing order was not filed until January 2005 (after <u>Crawford</u> was decided in March 2004), and the trial court's re-sentencing decision was affirmed in September 2006. Respondent concedes that <u>Crawford</u> applies to this case because Petitioner's convictions and sentences were "technically" not final when <u>Crawford</u> was decided. [Doc. 48-1, p. 14].

4. **The Georgia Supreme Court's Decision to Reject Petitioner's Confrontation Clause Claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.**

Robertson argues that his rights under the Confrontation Clause of the United States Constitution were violated by the admission of the tape recordings between Kenneth Brady and Gene Hammett.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him." U.S. Const. Amend. VI.

26

In Crawford, the United States Supreme Court held that the Sixth Amendment's Confrontation Clause prohibits the admission of "testimonial" statements by a witness who is absent from trial unless the declarant is unavailable and the defendant has had an opportunity to cross-examine the declarant on his statements.[4] The Court's decision in Crawford overruled its prior decision in Ohio v. Roberts, 448 U.S. 56 (1980), where the Supreme Court held that the Sixth Amendment's Confrontation Clause does not bar admission of the statement of an unavailable witness against a criminal defendant if the statement bears "adequate indicia of reliability." The test under Roberts required the evidence either to fall within a "firmly rooted hearsay exception," or to bear "particularized guarantees of trustworthiness." Id. at 66.

In Crawford, the Court did not define the term "testimonial." However the Court noted that the Confrontation Clause applies to "'witnesses' who bear testimony, which the Court indicated is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." United States v. Underwood, 446 F.3d 1340, 1346 (11th Cir. 2006) (citing Crawford, 541 U.S. at 51, 124 S. Ct. at 1364). As

---

[4]It appears that Kenneth Brady, the declarant, was unavailable [Doc. 20-2, p. 116-17], but his availability is irrelevant because it is undisputed that there was no opportunity for Robertson to cross-examine him on his statements.

further guidance on the meaning of the term "testimonial", the <u>Crawford</u> Court set

forth three formulations of the "core class of 'testimonial' statements":

> (1) "ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially", 541 U.S. at 51, 124 S.Ct. at 1364; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions" <u>id.;</u> and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." <u>Id.</u>

<u>Underwood</u>, 446 F.3d at 1347 (quoting <u>Crawford</u>, 541 U.S. at 51).

In cases decided after <u>Crawford</u>, the Supreme Court made clear that the

Confrontation Clause had no application to out-of-court nontestimonial statements.

<u>Davis v. Washington</u>, 547 U.S. 813, 823-24 (2006); <u>Whorton v. Bockting</u>, 549 U.S.

406, 420 (2007)("[T]he Confrontation Clause has no application to such statements

and therefore permits their admission even if they lack indicia of reliability.").

Therefore, a determination of whether the admission at trial of out-of-court statements

violated the Confrontation Clause now requires a determination of whether those

statements were testimonial.  If they were not testimonial, the Confrontation Clause

is not implicated, and Robertson's Confrontation Clause claim must be dismissed.

Thus, this court must decide whether the implicit decision of the Georgia Supreme

AO 72A
(Rev.8/8
2)

Court that Kenneth Brady's statements to Gene Hammett were not testimonial was contrary to, or an unreasonable application of, federal law.

The state court decision in Robertson was not contrary to federal law because there is no Supreme Court case with materially indistinguishable facts that was decided in a defendant's favor.  To be more specific, there is no Supreme Court Case that has decided that out-of-court statements, under the circumstances presented here, to an informant such as Hammett, were testimonial statements.

Further, the state court decision to reject Robertson's Confrontation Clause claim was not an "unreasonable application" of federal law because, under Crawford and its progeny, it appears that Hammett's statements and recordings were nontestimonial, and thus not subject to the Confrontation Clause.

I conclude that Kenneth Brady's out-of-court statements were more likely nontestimonial than testimonial because:  (1) they do not fall within, and are not similar to, any of the examples of testimonial statements given in Crawford or Davis, or that are the subject of the recent cases of Bullcoming v. New Mexico, 131 S.Ct. 2705 (2011) and Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009); (2) In Crawford and Davis the Supreme Court cites its earlier decision in Bourjaily v. United States, 483 U.S. 171, 181-84 (1987) for the proposition that statements made

unwittingly to a government informant are nontestimonial; (3) In <u>Underwood</u>, the Eleventh Circuit stated that testimonial statements are "statements made under circumstances which would lead the declarant to believe that the statement would be available for use at a later trial." <u>Underwood</u>, 446 F.3d at 1347 (citation omitted). Here, as in <u>Underwood</u>, the statements made by Kenneth Brady to Hammett, a confidential informant, were not made under circumstances in which Brady would have expected his statements to be used in court. <u>See</u> <u>also</u> <u>United States v.</u> <u>Makarenkov</u>, 401 F. App'x 442 (11th Cir. 2010) (finding that statements made to confidential informant were not testimonial).

Even if the state court decision was incorrect, Robertson would not prevail in this action. As discussed above, as long as fairminded jurists might disagree on the application of the law to Robertson's case, this court may not grant habeas relief. The distinction between testimonial vs. nontestimonial statements has not yet been fully developed, and at the very least, fairminded jurists might disagree on whether Hammett's statements were nontestimonial.

Robertson argues that Brady's statements to Hammett were not in the course of or in furtherance of a conspiracy to commit or conceal a crime. This argument raises

AO 72A
(Rev.8/8
2)

the issue of whether the statements were properly admitted under Georgia state law.[5]

A state court's evidentiary rulings present cognizable habeas claims only if they deprive a defendant of a specific constitutional right (such as the Sixth Amendment Right to Confrontation) or render the trial fundamentally unfair in violation of the Fourteenth Amendment right to due process. See Cupit v. Whitley, 28 F.3d 532, 536 (5th Cir. 1994); Pemberton v. Collins, 991 F.2d 1218, 1226 (5th Cir. 1993). Robertson does not have a claim in this court that the trial court's evidentiary rulings under Georgia law rendered his trial fundamentally unfair and thus violated his Fourteenth Amendment right to due process. Even if he had raised such a claim, this court would have to dismiss it as unexhausted and procedurally defaulted in the state court.

Further, the argument that Brady's out-of-court statements were not in the course of, or in furtherance of, a conspiracy to commit or conceal a crime does not address the separate issue of whether the statements violated the Confrontation Clause. Even if the admission of out-of-court statements were in violation of state hearsay rules or lacked indicia of reliability, after Crawford, Davis and Bockting, such

---

[5]Unlike federal law, Georgia law allows the admission of co-conspirator statements made during the concealment phase of the conspiracy. O.C.G.A. § 24-3-5; Dutton v. Evans, 400 U.S. 74 (1970)

statements do not implicate the Confrontation Clause unless they were testimonial. <u>See</u>

<u>United States v. Honken</u> 378 F. Supp. 2d 928, 957 (N.D. Iowa 2004)(concluding that

"without regard to whether or not they are co-conspirator statements" certain evidence

was not testimonial, and therefore <u>Crawford</u> did not apply);   <u>See</u> <u>generally</u> <u>United</u>

<u>States v. Smalls</u>, 605 F.3d 765, 773-780 (10th Cir. 2010) (thoroughly discussing

<u>Crawford</u>, <u>Davis</u> and <u>Bockting</u>, and noting that these cases made clear that <u>Roberts</u>

was overruled in its entirety, and the Confrontation Clause permits the admission of

nontestimonial statements "even if they lack indicia of reliability")(citations omitted).

For the above reasons, the Georgia Supreme Court's (implicit) decision to reject

Petitioner's Confrontation Clause claim as to Kenneth Brady's statements to Hammett

was not contrary to, and did not involve an unreasonable application of, clearly

established federal law, as determined by the Supreme Court of the United States.

Accordingly, this claim should be denied.

AO 72A
(Rev.8/8
2)

**C.   Sufficiency of the Evidence**

Robertson argues that the state presented insufficient evidence to convict him of any of the offenses of which he was convicted.[6]   Under federal due process standards, evidence is sufficient to support a criminal conviction if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  A federal court must presume that the jury resolved all conflicts in the testimony in favor of the state. Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987).

Under Georgia law, felony murder occurs when a person "causes the death of another human being irrespective of malice" during "the commission of a felony." O.C.G.A. § 16-5-1(c).  The trial court's instructions permitted the jury to convict Robertson of felony murder if a jury could find that he committed one of the charged felonies (burglary, conspiracy to commit burglary, armed robbery, or conspiracy to

---

[6]Robertson was originally charged with and convicted of conspiracy to commit burglary, burglary, conspiracy to commit armed robbery, armed robbery and felony murder.  The trial court merged the conspiracy convictions with their related substantive offenses.  The Georgia Supreme Court vacated Robertson's conviction for armed robbery (which had been merged with the conviction for conspiracy to commit armed robbery) finding that armed robbery merged with the felony murder conviction as the underlying felony. Robertson, 493 S.E.2d at 705.

AO 72A
(Rev.8/8
2)

commit armed robbery), if the felony caused the death of another person, even if he did not commit murder or intend to commit murder. [Doc. 23-7 at 59]. Robertson does not contend that the trial court's instructions were incorrect.

The Georgia Supreme Court cited <u>Jackson</u> and held that the evidence against Robertson "was sufficient to enable a rational trier of fact to find defendant guilty beyond a reasonable doubt of burglary, armed robbery and felony murder." <u>Robertson</u>, 268 Ga. at 773.

Robertson compares his case to two other Georgia appellate cases, <u>Moore v. State</u>, 255 Ga 519 (1986) and <u>James v. State</u>, 260 Ga. App. 350 (2003), in which the Georgia appellate courts reversed convictions for insufficient evidence. In <u>Moore</u>, the defendant had been convicted of felony murder based on a conspiracy theory, and in <u>James</u>, the defendant had been convicted for several offenses arising out of a home invasion that had been committed by others. <u>Robertson</u> argues that this court should grant him relief on his claim of insufficient evidence because there was more evidence of guilt in those cases than was present against him in his trial.

Defendant's comparative analysis uses the wrong standard for reviewing a habeas claim of insufficient evidence. The correct standard is whether the Georgia Supreme Court's rejection of Robertson's insufficiency of evidence claim on direct

AO 72A
(Rev.8/8
2)

appeal was an unreasonable application of <u>Jackson v. Virginia</u>; and <u>Jackson</u> directs federal courts to review the record evidence of petitioner's trial to determine if any rational trier of fact could have found proof of guilt beyond a reasonable doubt.  The reviewing court must consider all of the evidence admitted by the trial court even if it was admitted erroneously.  <u>See</u> <u>McDaniel v. Brown</u>, 130 S. Ct. 665, 673 (2010).

Applying the correct standard, I cannot find that the Georgia Supreme Court unreasonably applied <u>Jackson v.Virginia</u>.  Robertson emphasizes that there is no evidence of what information Robertson may have supplied to Brady or what Robertson knew about what Brady intended to do with any information he may have supplied.  However, there was evidence from which a juror could conclude that (1) Robertson showed Kenneth Brady where the Reids lived shortly before the murders; (2) after the murders, Kenneth Brady threatened to kill Robertson if he said anything and insisted that Robertson take some money; (3) there was a "set-up man" for the murders;  (4) the same "set-up man" had provided information to be used for other burglaries in the area; and (5) Robertson was that "set-up man".  These facts, and the other evidence summarized by the Georgia Supreme Court, lead me to the conclusion that the Georgia Supreme Court did not unreasonably apply federal law in finding that there was sufficient evidence that Robertson was guilty of conspiring to

commit the underlying felony of armed robbery or burglary of the Reids's house, and therefore, felony murder.

Even if this court were to compare Robertson's case to the Georgia Appellate cases relied upon by Robertson, the facts in those cases are too dissimilar to Robertson's case to make a meaningful comparison of the weight of the evidence. In addition, as Respondent points out, this court does not have the record of the other Georgia cases, making a complete comparison impossible.

For these reasons, Robertson's insufficiency of the evidence claim should be dismissed.

### D. <u>Ineffective Assistance of Counsel Claims</u>

Petitioner was represented at trial and on appeal by attorney Glenville Haldi. Robertson's amended petition incorporates all of the ineffective assistance of counsel claims raised in his initial, <u>pro se</u>, petition. (Doc. 38 at p. 40). These claims are:

(1) ineffective assistance of trial counsel based on trial counsel's failure to:

  a. prevent the state from using co-indictee Avery's allegedly "perjured testimony" about whether Avery was "guilty" of the crimes against the Reids;

  b. object to remarks, during voir dire, of a potential juror who, while employed as a police dispatcher, saw Petitioner at the city jail;

36

    c.    specifically object to the prosecutor engaging in misconduct by deliberately introducing evidence that Petitioner had testified at the trial of co-indictees Avery and Brady;

    d.    object to the admission of taped conversations between Kenneth Brady and Gene Hammett;

    e.    raise ineffective assistance based on his first attorney's stipulation about a polygraph examination;

    f.    move to suppress Petitioner's statements to law enforcement made in connection with taking a polygraph test;

    g.    document the pretrial publicity for the change of venue motion and not vigorously pursuing the motion to recuse the trial judge;

    h.    agree to the jury foreman being released to take a pre-planned vacation, which caused this juror to be prejudiced toward the defense;

    i.    properly research and object to witness Avery's similar transaction testimony;

    j.    object to the prosecutor's closing argument;

    k.    avoid cumulative errors, as delineated above, which undermined the adversary process and cast doubt on the reliability of the trial;

2.    ineffective assistance of appellate counsel based on appellate counsel's failure to:

37

a.      properly raise on appeal that the trial court erred by refusing to give some of Petitioner's requested charges to the jury;

b.      raise a "DePalma violation" when challenging the trial court's denial of the motion for directed verdict of acquittal;

c.      raise an unpreserved issue about whether the prosecutor was afforded an extra opening statement during voir dire;

d.      raise a claim about bolstering when challenging the admission of Agent Attaway's testimony about co-indictee Avery's statement;

e.      secure a ruling on the issue of whether it was error for the trial court to charge the jury that felony murder was a "lesser included offense" of malice murder;

f.      advance "beyond the state habeas trial court" the claim that the trial judge erred in sentencing Petitioner;

g.      fully perfect the record for appeal to have all relevant documents included; and

h.      preserve and raise a chain of custody issue about the taped conversation between co-indictee Brady and Gene Hammett.

[Doc. 1]

The Supreme Court precedent applicable to ineffective assistance of counsel claims was set forth in Strickland v. Washington, 466 U.S. 668, 698 (1984).  To make a successful claim of ineffective assistance of counsel, a petitioner must show that:

(1) his counsel's performance was deficient; and (2) that the deficient performance prejudiced his defense.  <u>Strickland</u>, 466 U.S. at 697.  A petitioner must first show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  <u>Id.</u> at 690.  The court must be "highly deferential" and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Id.</u> at 689.  To make such a showing, a petitioner must demonstrate that "no competent counsel would have taken the action that his counsel did take."  <u>United States v. Freixas</u>, 332 F.3d 1314, 1319-20 (11th Cir. 2003) (quotation omitted).  "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."  <u>White v. Singletary</u>, 972 F.2d 1218, 1220 (11th Cir. 1992).

In order to meet the second prong of the test, the petitioner must demonstrate that counsel's unreasonable acts or omissions prejudiced him.  That is, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.  "The cases in which habeas petitioners can properly prevail on the ground of

39

AO 72A
(Rev.8/8
2)

ineffective assistance of counsel are few and far between." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994).

Petitioner raised his ineffective assistance of counsel claims in his state habeas corpus petition. The state habeas corpus court identified and applied the <u>Strickland</u> standard to Petitioner's claims and found that Haldi provided reasonably effective, professionally competent representation to Petitioner. [Doc. 12-8].

Petitioner has failed to show that the decision by the state habeas corpus court on his ineffective assistance of counsel claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The state habeas corpus court identified and applied the proper Supreme Court precedent to Petitioner's ineffective assistance of counsel claims.

Likewise, Petitioner has not shown that the decision by the state habeas corpus court was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." 28 U.S.C. § 2254(d). Haldi testified at the state habeas corpus hearing that he had been practicing law since 1962, and that he was originally retained but later appointed for trial and appeal. [Doc. 18-1, p. 23]. Haldi testified that he took over the criminal case from attorney John Folsom, who had

become involved before the indictment was returned and who had agreed for Petitioner to take a polygraph exam. [<u>Id.</u> at 23, 29]. Haldi investigated Petitioner's case, followed up on leads for potential alibi witnesses, and posed a theory as part of his defense that the case was an execution-style murder that involved a drug transaction. [<u>Id.</u> at 23, 25, 27]. Haldi filed numerous motions, which the trial court granted in part and denied in part, and raised twenty-six errors on appeal.

I discuss each of Petitioner's claims of ineffective assistance of counsel below:

a. <u>Ground 1(a)</u>

Petitioner contends in Ground 1(a) that counsel was ineffective by failing to object to Avery's testimony on the ground that the State's use of Avery's testimony constituted knowing use of "perjured testimony". On direct appeal, counsel argued that the State should have been estopped from relying on Avery's testimony at trial because Avery's testimony denying guilt for the Reids' murder was inconsistent with the fact that he had been convicted of their murder. The Georgia Supreme Court found that this issue had not been preserved. <u>Robertson</u>, 493 S.E.2d at 701.

Petitioner's complaint is that trial counsel did not preserve this issue for appeal. However, failure to preserve an issue does not constitute ineffective assistance of counsel if the issue does not have merit. <u>See</u> <u>Chandler v. Moore</u>, 240 F.3d 907, 917

41

(11th Cir. 2001) (noting appellate counsel is not ineffective for failing to raise a meritless issue on appeal). It is clear from the record that this issue did not have merit.

Avery had been granted derivative use immunity to testify at trial, but was informed that he could be prosecuted if he committed perjury. [Doc. 21-4, pp. 34-35]. Avery admitted that he had been found guilty of the Reid crimes and provided his sentences for the convictions. [Id. at 35, 37]. Petitioner claims Avery committed perjury in the following colloquy:

> Q. [by prosecutor] Are you denying or admitting that you were with Tony and Kathy Reid when they were murdered?
>
> A. [by Avery] I wasn't there when they were murdered.
>
> Q. But you've been convicted of that, haven't you?
>
> A. Yes.

[Doc. 21-4, p. 61].

This colloquy shows that Avery admitted that he had been convicted of participating in the Reid murders. Avery's statement that he was not present at the time of the murders is not inconsistent with his guilt or with the Georgia Supreme Court's recitation of the facts which suggests that Avery was not present in the Reids'

42

home until after they had been killed.  Thus, trial counsel was not ineffective for failing to argue this claim at trial.

      b.  Ground 1(b)

In Ground 1(b), Petitioner contends that his trial counsel was ineffective for not objecting during voir dire to the statement of a potential juror that he knew that Petitioner had been in the city jail while he (the potential juror) had been employed as a police dispatcher in January 1993. [Doc. 19-2, p. 811].  After all the members of the jury panel were qualified, counsel claimed that the panel had been "tainted" and Petitioner's character had been put in issue.  [Doc. 19-3, pp. 906-907].  The trial court denied the request to discharge the panel.  [Id. at 909].  Counsel raised this issue as the tenth enumeration on appeal, and the Georgia Supreme Court found that the claim was "not preserved for appellate review."  Robertson, 493 S.E.2d at 702.

Petitioner has not shown that he was prejudiced by the remarks, as they did not involve Petitioner's guilt or innocence.  See, e.g., Logan v. State, 593 S.E.2d 14, 16 (Ga. 2003)  (holding trial court did not err by denying defendant's request that the entire panel be struck where prospective juror's comment did not imply that defendant was guilty of the crime with which he was charged); Hughey v. State, 348 S.E.2d 901

43

(Ga. 1986) (trial court's failure to dismiss panel after prospective juror stated he had previously arrested defendant was not error).  Thus, Petitioner's trial counsel was not constitutionally ineffective since Petitioner cannot show how he was prejudiced by counsel's failure to object to the juror's comments during voir dire.

     c.  <u>Ground 1(c)</u>

Petitioner contends that trial counsel was ineffective because he did not assert at trial that the prosecutor engaged in misconduct by deliberately introducing evidence that Petitioner had testified at the trial of Avery and Brady.  Counsel raised as error on appeal that the trial court erred in permitting the jury to hear that Petitioner had testified at the trial of Avery and Brady.  <u>Robertson</u>, 493 S.E.2d at 702.  Petitioner claimed that since he had been granted immunity to testify, that the remark violated state law.  <u>Id.</u>

At trial, GBI Agent Attaway testified that Petitioner had been a witness in the Avery and Brady case.  [Doc. 19-6, p. 64].  After the jury was told that the trial was recessing for the day, Petitioner's counsel moved for a mistrial on two bases, one of which was the question to the agent about Petitioner's testimony.  [<u>Id.</u> at 71-72].  The trial court reserved ruling and gave counsel a chance to provide authority.  [<u>Id.</u> at 74].

44

The next morning, after hearing from both sides, the trial court  instructed the jury to disregard the question and answer.  [Doc. 20-1, pp. 35-36].

Although the Georgia Supreme Court found that the assertion of prosecutorial misconduct (for asking the agent about Petitioner's testimony at the trial of Avery and Brady) had not been preserved, the Court did address whether the agent's testimony constituted harmful error.  The Court found that there was no harmful error in the agent's testimony because the "trial court's curative instruction was sufficient to remove any potential prejudice."  Robertson, 493 S.E.2d at 702.

Jurors are presumed to follow the trial court's instructions.  See Brown v. Jones, 255 F.3d 1273, 1280 (11th Cir. 2001) (citing Ingram v. Zant, 26 F.3d 1047, 1053 (11th Cir. 1994) ("Because we presume that jurors follow such instructions, we must assume that the jury put aside any biases it may have had, applied the legal standards as enunciated in the jury instructions, and based its sentencing decision on the facts introduced at trial and sentencing.")).  Thus, Petitioner has not shown that he was prejudiced by the agent's testimony.  Accordingly, Petitioner's claim that counsel was ineffective for failing to specifically allege prosecutorial misconduct for eliciting the agent's testimony is without merit.

45

d.  Ground 1(d)

Petitioner argues that counsel did not object to the admission of taped conversations between Gene Hammett and Kenneth Brady.   However, counsel did object at trial and challenge on appeal the admission of the taped conversations between Brady and Hammett.  Robertson, 493 S.E.2d at 704.  The Georgia Supreme Court rejected this argument, finding that the taped conversations were properly admitted.  Id.  Thus, Petitioner's claim of ineffective assistance for failure to raise the issue fails.

e.  Ground 1(e)

It appears that Petitioner is arguing, in this ground, that Haldi was ineffective for not raising a claim of ineffectiveness against John Folsom ("Folsom"), the attorney who represented Petitioner prior to trial.  Petitioner apparently contends that Haldi should have raised issues of ineffectiveness against Folsom (via a motion for new trial) because:   (1) Folsom gave Petitioner poor advice that resulted in Petitioner giving statements to the police that were used against him at trial and led to other evidence against him; and (2) Folsom did not obtain a binding agreement that the results of Petitioner's polygraph could be admitted into evidence. [Doc. 1, p. 12].

46

Petitioner apparently argues that Folsom gave him bad advice when he advised him to give a statement to the police in exchange for a promise that the results of a polygraph examination of Petitioner could come into evidence.  [Doc. 18-2, p. 50]. Prior to trial, the trial judge had a hearing on the state's motion in limine to exclude the results of the polygraph examination.   The police officer who interviewed Petitioner testified that there was no agreement with Folsom for the admission of Petitioner's polygraph results.  [Doc. 18-5, p. 443, 451, 460].   The trial judge apparently agreed with the officer because he ruled that the results of the polygraph examination were inadmissible.  [Doc. 18-11, p. 137].

Folsom testified at trial that he thought he had reached an agreement with the police for the results of Petitioner's polygraph examination to be admitted at trial. However, Folsom also testified that he did not recall having an understanding with the police that defendant's statement was contingent on the polygraph examination being admitted into evidence.  There is no evidence that Folsom had such an agreement with the police.  [Doc. 21-6, p. 74].

Moreover, as discussed below, Petitioner gave his first interview to the police before he was represented by Folsom.   His later interviews, while represented by Folsom, were largely the same as his first interview.  In his later interviews with the

47

police, Petitioner never admitted that he had any part in the Reid murders. Therefore, even if Folsom had advised Petitioner to talk to the police, that advice was a strategic decision that cannot form the basis of an ineffective assistance claim. Therefore, there was no basis for Haldi to charge Folsom with ineffectiveness in connection with Petitioner's statement to the police.

Likewise, Petitioner has not shown that Folsom was ineffective in failing to enter into an enforceable agreement that the polygraph would be entered into evidence. Folsom contended (but the police disputed) that he had an agreement with the police for the admission of the polygraph results. On appeal, Haldi challenged the trial court's failure to admit the polygraph results. The Georgia Supreme Court found no error since the state did not stipulate to the admissibility of the polygraph results. Robertson, 493 S.E.2d at 705. The Court's determination was supported by the record.

Even if the court's determination that there was no stipulation for the admissibility of the polygraph results was based on Folsom's failure to pursue a stipulation with the proper party (the district attorney), Petitioner has made no showing that the district attorney would have agreed to such a stipulation. Thus, there

AO 72A
(Rev.8/8
2)

was no basis to charge Folsom with ineffective assistance of counsel for his handling of the polygraph issue.

### f.  Ground 1(f)

Petitioner argues that Haldi was ineffective at trial by failing to move to suppress Petitioner's statements to law enforcement on the grounds of voluntariness. Petitioner gave interviews to the police on three different occasions.  At trial, the state introduced evidence of the three interviews.   At the first interview, which was videotaped, no attorney was present.  Petitioner drove himself to the Sheriff's Office at the request of the police.  He was given <u>Miranda</u> warnings.  [Doc. 21-2, p. 32].  At some point, Petitioner said he wanted to talk to an attorney.   The trial court ruled that any statements after that point were inadmissible.   [Doc. 21-2, pp. 86-89].

The second two interviews were with Attorney Folsom present.  [Doc. 21-2, pp. 30-94, 98].  The information given in the second two interviews was substantially the same as that given in the first interview.  [<u>Id.</u> at 98-102].  Petitioner contends that Haldi should have argued, via a motion to suppress, that Petitioner's statements were not voluntary because they were induced by a promise that the results of his polygraph examination would be admissible in court. [Doc. 1, p. 13].

49

The first interview took place after a police officer had asked Petitioner if he would come to the sheriff's office for an interview.  [Doc. 21-2, p. 72].  There is no evidence or contention that the subject of a polygraph had come up at the time of that first interview.  Thus, there would have been no grounds for Haldi to move to suppress that interview based on a promise related to the polygraph examination.

Because the second and third interviews were substantially the same as the first, there would have been no benefit to challenging their admissibility.  Moreover, even Folsom testified that he was unaware of any agreement that these interviews were contingent on the admission of the polygraph results.  [Doc. 21-6, p. 74].

Finally, Petitioner has failed to show how he was prejudiced by the admission of his statements, in which he denied involvement in the murders.

g.  Ground 1(g)

Petitioner contends that counsel was ineffective at trial for failing to document the pretrial publicity for the change of venue motion and not vigorously pursuing the motion to recuse the trial judge.  Prior to the start of the trial, Haldi made a motion for change of venue based on pre-trial publicity.  [Doc. 19-4, p. 116].  The motion was denied.  [Id., p. 128].  Petitioner has not shown the existence of any publicity that was not included in the record by counsel.

Furthermore, regardless of how vigorously the recusal motion was pursued, Petitioner would not have prevailed, as Petitioner has failed to establish extrajudicial bias, which is required under state law.  See Birt v. State, 350 S.E.2d 241, 243 (Ga. 1986).  Thus, Petitioner has not shown that counsel was ineffective with regard to these claims.

> h.  Ground 1(h)

Petitioner argues that counsel was ineffective at trial for objecting to the jury foreman being released because continued service would interfere with a pre-planned vacation, which caused this juror to be prejudiced toward the defense.  Petitioner's counsel testified at the state habeas corpus hearing that he objected because he did not like the alternate. [Doc. 18, Att. 1 at 40].  Petitioner assumes that, since the jury was not sequestered, the foreman could have learned that it was the defense that blocked his plans and prejudiced the defense.  However, Petitioner's claim relies on speculation, which does not satisfy Strickland's prejudice prong.  See Harris v. Crosby, 151 F. App'x 736, 738 (11th Cir. 2005) (holding speculation is insufficient to demonstrate prejudice).

AO 72A
(Rev.8/8
2)

I. Ground 1(I)

Petitioner contends that counsel was ineffective at trial for failing to properly research and object to witness Avery's similar transaction testimony. Counsel withdrew his objection to similar transaction evidence about Avery's burglaries of the Peach State companies. The trial court conducted a pretrial hearing as required by Uniform Superior Court Rule 31.1 on the admissibility of all three similar transaction incidents: (a) the burglary of the Peach State companies; (b) the planned burglary of the residence of Jerry Reed; and (c) a visit between Brady and Avery where Avery was provided stolen credit cards to obtain property. [Doc. 19, Att. 5 at 26-72]. The trial court ruled that the Jerry Reed planned burglary was admissible but the other two were not. As to the burglary of the Peach State companies, the trial court initially ruled that the state's evidence connecting Petitioner was hearsay. [Id. at 67-69].

The prosecutor later asked the trial court to revisit the ruling about the Peach State companies since Avery would testify that Brady told him during the concealment phase of the conspiracy that the same person supplied the information for the Tony Reid murders and the Jerry Reed burglary and that individual worked at Peach State Motors. Haldi then withdrew his objection to the testimony from Avery that Avery committed the burglaries of the Peach State companies, and that Kenneth Brady told

52

him (Avery) that the same person who set up those burglaries set up the Reid murders. Haldi did not withdraw his objection to Avery's other testimony about what Brady had said.  [Doc. 21, Att. 3 at 109-116].  In response to questioning by the trial judge, Petitioner stated he had discussed the matter with Haldi and agreed with Haldi's decision  [Id. at 114-115].

Petitioner now complains that Haldi's advice was wrong, as the admission of the testimony about the Peach State burglaries led to Avery's testimony that Brady showed him the home of the "set up man," and also told him that if anything happened to Brady, Avery "should kill the 'set up' man."  [Doc. 21-4, p. 85; 21-5, p.  68].

However, Haldi's advice was based on a reasonable strategy.  Haldi used evidence about the timing of the Peach State burglaries to argue Robertson's innocence.  Specifically, in his closing argument, Haldi argued that (1) the Peach State burglaries had occurred in November 1989; (2) Robertson did not meet Kenneth Brady until December of 1989; (3) Avery testified that the same person who gave Kenneth Brady information to set up the Peach State burglaries also gave Brady information to set up the murders; and (4) therefore, Robertson could not have been that "set-up" person. [Doc. 22-6 at 7-9].  Haldi also argued these facts in his appellate brief as proof that Robertson could not have been the "set-up" person. [Doc. 18-3, p.

53

1]. It is apparent that Haldi made a strategic decision not to object to the evidence about the Peach State burglaries, so that he could set up this argument. This strategic decision cannot form the basis of an ineffective assistance of counsel claim.

Further, Haldi did object to the other damaging testimony from Avery regarding what Kenneth Brady told Avery, and those objections were preserved for appeal. As discussed above, the Georgia Supreme Court addressed Robertson's objection to Avery's testimony, but ruled that Avery's statements were admissible under Georgia's co-conspirator exception to the hearsay rule, as Georgia permits the admission of statements made during the concealment phase of a conspiracy, and Brady's statements to Avery "show that he was still conspiring to conceal the crimes." Robertson. 493 S.E.2d at 704. Thus, counsel was not ineffective for failing to object to Avery's similar transaction testimony.

> j.  Ground 1(j)

Petitioner argues that counsel was ineffective at trial because he failed to object to the prosecutor's closing argument. Specifically, Petitioner contends that trial counsel should have objected when the prosecutor commented about the co-conspirators' convictions. During his closing argument, the prosecutor noted that the jury was representing the community, that "two of the three people involved" in the

AO 72A
(Rev.8/8
2)

murders had been convicted, and that "the rest of the job is now." [Doc. 22-6, pp. 33-34].

Petitioner presents no basis for this court to find that the prosecutor's comments rose to the level of a constitutional violation or that he was prejudiced by counsel's failure to object to the comments. Thus, Petitioner is not entitled to relief on this claim.

k.  Ground 1(k)

Petitioner contends that counsel's cumulative errors, as delineated above, undermined the adversary process and cast doubt on the reliability of the trial. Since Petitioner's individual ineffective assistance of trial counsel claims fail, his claim of "cumulative errors" is also without merit. If Petitioner's ineffective assistance of counsel claims are insufficient individually, "they do not become sufficient merely because he raises them cumulatively." Kelley v. Sec.'y Dep't of Corr., No. 8:08-CV-2071T30EAJ, 2006 WL 334210 at *16 (M.D. Fla. Feb. 13, 2006); see also Castro v. Ward, 138 F.3d 810, 832 (10th Cir. 1998) ("Cumulative error analysis applies where there are two or more actual errors. It does not apply however, to the cumulative

effect of non-errors." (quotation and citation omitted)).  Accordingly, Petitioner's claim fails to state a claim for relief.

### 2. Petitioner Received Effective Assistance Of Appellate Counsel.

Petitioner has raised several claims of ineffective assistance of appellate counsel.  The Strickland standard also applies to ineffective assistance of appellate counsel claims.  See Smith v. Robbins, 528 U.S. 259, 285, 287-88 (2000); see also Temple v. Morton, No. 06-15061, 2007 WL 2141823 (11th Cir. July 27, 2007) ("The Supreme Court has held that the Strickland analysis also applies to claims of ineffective assistance of appellate counsel.").  To render effective assistance on appeal, counsel need not present every argument, regardless of merit, requested by a petitioner.  See Jones v. Barnes, 463 U.S. 745, 750 (1983).  A petitioner does not have a right to compel appellate counsel to press non-frivolous points requested by the petitioner if appellate counsel determines, as a matter of professional judgment, that those issues should not be raised.  See Sullivan v. Wainwright, 695 F.2d 1306, 1309 (11th Cir. 1983).

a.  Ground 2(a)

Petitioner contends that counsel failed to properly raise on appeal that the trial court erred by refusing to give some of Petitioner's requested charges to the jury.

AO 72A
(Rev.8/8
2)

Petitioner's counsel raised this claim on appeal, and the Georgia Supreme Court found that there was nothing to review since the requests were not in the record. <u>Robertson</u>, 493 S.E.2d at 704-05. Petitioner does not specify which requests were not included in the record. Thus, Petitioner has not shown how he was prejudiced by counsel's failure to properly raise the claim on appeal.

  b.   <u>Ground 2(b)</u>

  Petitioner contends that counsel was ineffective on appeal by failing to raise a "DePalma violation" when challenging the trial court's denial of the motion for directed verdict of acquittal. Petitioner's argument refers to <u>DePalma v. State</u>, 225 Ga. 465 (1969), which set forth a general rule that the allegations and proof in a criminal case must correspond. <u>Id.</u> at 469. However, counsel did raise on appeal a "DePalma violation" in which he claimed that the state's evidence was at variance with the indictment. [Doc. 18-3, pp. 6-12]. Specifically, counsel argued that, because the indictment alleged that Petitioner conspired with both Felton Avery and Kenneth Brady, and Avery testified that he did not commit the murders or conspire to commit any criminal act that caused the murders, there existed a "fatal variance." [<u>Id.</u>]. The Georgia Supreme Court found no error. Thus, Petitioner's claim of ineffective assistance of appellate counsel is without merit.

AO 72A
(Rev.8/8
2)

### c. Ground 2(c)

Petitioner argues that counsel was ineffective on appeal for failing to raise an unpreserved issue about whether the prosecutor was afforded an extra opening statement during voir dire.  However, counsel did raise a claim on appeal complaining about the prosecutor's participation in the voir dire process by reading the indictment aloud, asking the first three questions required by O.C.G.A. § 15-12-164(a) to the venires, and announcing that the jurors appeared qualified.  [Doc. 18-3, pp. 16-17]. The Georgia Supreme Court found that the claim was without merit, as the trial court could delegate its responsibilities to officers of the court.  Robertson, 493 S.E.2d at 701.

Petitioner contends that counsel should have, but did not also raise on appeal that the prosecutor was improperly allowed to make "explanatory" comments about the indictment.  However, Petitioner has not shown that the outcome of the appeal would have been different had appellate counsel argued this additional point. Thus, Petitioner is not entitled to relief.

### d. Ground 2(d)

Petitioner contends that counsel was ineffective on appeal for failing to raise a claim about bolstering when challenging the admission of Agent Attaway's

58

AO 72A
(Rev.8/8
2)

testimony about Avery's statement.  Petitioner's appellate counsel raised as error on appeal that the trial court erred in allowing the state to introduce hearsay statements from GBI Agent Attaway to corroborate  Felton Avery's "hearsay" statements. [Doc. 18-3, pp. 38-39].  The Georgia Supreme Court found that the statements were properly admitted as prior consistent statements.  Robertson, 493 S.E.2d at 703. Petitioner does not explain how appellate counsel's failure to specifically raise on appeal a claim of "bolstering" based on Attaway's testimony would have changed the appellate court's opinion.  Accordingly, Petitioner fails to state a claim for relief.

　　　e. Ground 2(e)

　　　Petitioner faults appellate counsel for failing to secure a ruling on the issue of whether it was error for the trial court to charge the jury that felony murder was a "lesser included offense" of malice murder.  However, appellate counsel raised this issue as error on appeal.  [Doc. 18-3, pp. 57-60].  The law in Georgia provides that a defendant is put on notice that he may be convicted of a lesser crime included in a crime charged in the indictment as a matter of fact or as a matter of law.  McCrary v. State, 314 S.E.2d 662, 665 (Ga. 1984).  Relying on McCrary, the Georgia Supreme Court held that it need not decide the issue since "felony murder can be an included offense of malice murder," and Petitioner could show no harm from the "addition of

59

the word 'lesser.'" <u>Robertson</u>, 493 S.E.2d at 704.   Thus, Petitioner's claim of ineffective assistance of appellate counsel is without merit.

      f.   <u>Ground 2(f)</u>

Petitioner argues that appellate counsel was ineffective for not advancing the claim that the trial court erred in sentencing Petitioner "beyond the state habeas trial court." [Doc. 1, p. 23].   Petitioner fails to state a claim for relief, as there is no right to counsel beyond the first appeal as of right in a criminal case. <u>Ross v. Moffitt</u>, 417 U.S. 600 (1974).   Thus, since Petitioner had no right to counsel at the state habeas corpus level, he could not have been deprived of effective assistance. <u>See</u> <u>Wainwright v. Torna</u>, 455 U.S. 586 (1982) (holding that since petitioner had no constitutional right to counsel to pursue discretionary review, he was not deprived of effective assistance of counsel).

      g.   <u>Ground 2(g)</u>

Petitioner claims that counsel did not fully perfect the record for appeal to have all relevant documents included:  the requests to charge; the record and transcripts of Brady's and Avery's convictions; and the order granting Petitioner immunity. However, Petitioner has not shown how the failure of appellate counsel to include these documents in the appeal record would have changed the outcome of the appeal.

Petitioner has not offered the omitted requests to charge, and the records of the co-indictees' convictions are not evidence in his case. Accordingly, Petitioner is not entitled to relief as to this claim.

h. Ground 2(h)

Petitioner contends that appellate counsel failed to preserve and raise a chain of custody issue about the taped conversation between Kenneth Brady and Gene Hammett. However, Petitioner has not proven that such a "gap" exists. Furthermore, the Georgia Supreme Court held that the state "established a proper foundation for the use of the tapes." Robertson, 493 S.E.2d at 704. Thus, Petitioner's claim is without merit.

Petitioner has failed, therefore, to demonstrate that the state habeas corpus court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to federal habeas corpus relief on his ineffective assistance of counsel claims.

## IV.   <u>CERTIFICATE OF APPEALABILITY</u>

According to Rule 11 of the Rules Governing Section 2254 Proceedings for the United States District Courts, a district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Pursuant to 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue unless "the applicant has made a substantial showing of the denial of a constitutional right."  A prisoner satisfies this standard by demonstrating that reasonable jurists would find that the district court's assessment of his constitutional claims is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable.  <u>See Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Petitioner has failed to make a substantial showing of being denied a constitutional right, because the claims he has raised in his petition and amended petition are without merit.  Accordingly, **I RECOMMEND** that a certificate of appealability be **DENIED**.

## V.  <u>CONCLUSION</u>

For the reasons given above, **I RECOMMEND** that Petitioner Billy Ray Robertson's petition for a writ of habeas corpus [Doc. 1] and First Amended Petition

AO 72A
(Rev.8/8
2)

for Writ of Habeas Corpus [Doc. 38] be **DENIED** and that the instant action be

**DISMISSED**.

The Clerk of this Court is **DIRECTED** to terminate the referral to the

Magistrate Judge.

**IT IS SO RECOMMENDED**, this 12th day of August, 2011.


_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)